In re Jack F. GADBERRY.

Bankruptcy No. 382–01631.
Adv. No. 383–0057.

United States Bankruptcy Court,
C.D. Illinois.

Feb. 3, 1984.

Gregory Barnes, Thomas M. Wheeler, LTD., Attys. at Law, Decatur, Ill., for the bank.

Jon D. Robinson, Hull, Campbell & Robinson, Attys. at Law, Decatur, Ill., for debtor.

BASIL H. COUTRAKON, Bankruptcy Judge.

This action comes to the Court for a determination of the dischargeability of a debt due the Central National Bank of Mattoon (the bank) by debtor Jack F. Gadberry pursuant to 11 U.S.C. § 523(a)(2)(B). (Count II of Complaint) * The Court encounters Dischargeability Complaints on false financial statements practically every week, but now directly faced with a specific challenge to its philosophy concerning renewals, welcomes the opportunity to speak.

The Court makes the following findings of fact. In January, 1980 the East Central Illinois Dairy Queen Co., Inc. executed a note with the bank for $120,000. As the debtor was one of four partners to a 1975 Partnership Agreement formed to own and operate a Dairy Queen franchise, he was asked to and did provide a financial statement. Among the assets of the debtor was listed a beneficial interest in a land trust. All four partners guaranteed this loan.

Gadberry assigned the beneficial interest in the aforementioned land trust to his parents on May 30, 1980. The $120,000 note was renewed on March 2, 1981. Yet neither this note nor this renewal has been made an issue here.

In June, 1981 the bank considered itself insecure. Because East Central Illinois Dairy Queen Co., Inc. had ceased to own or operate a franchise there was a lack of collateral. To cure what it considered to be

---

* Count I of Complaint has been resolved in the debtor's favor, but the Court has yet to receive an Order on it from the debtor.

a default, the bank then asked each partner/guarantor to pay one quarter of the debt within ten days. Defendant's Exhibit 3.

Nonetheless, no action on the default was taken by the bank until two and one-half months later when a renewal for each partner individually was issued in September, 1981. Gadberry alleges that he objected to this re-arrangement. It is at this time that the bank contends it sustained a loss by releasing the other partners from the debt as a whole and by the addition of new money to Gadberry's segment. This new money, $10,000, was Gadberry's share of the partners' debt to another bank which the Central National Bank paid. With accumulated interest, Gadberry then had a $43,000 note.

There is certain proof that at this time the debtor caused the bank to rely upon the no longer true January, 1980 financial statement by assigning the bank the beneficial interest in the land trust already assigned to his partners.

On the basis of the use of a statement that was false in September, 1981 the bank contends that the entire $43,000 debt is not dischargeable. The bank's argument principally relies upon *First American National v. Carter, (In re Carter),* 11 B.R. 992, 7 BCD 1046, 5 CBC 2d 357, BLD ¶ 68249 (Bkrtcy.M. D.Tn., 1981) as well as upon several other opinions which briefly cite *Carter* with approval. The Court hereby respectfully disagrees with the opinion expressed in *Carter* as being one that is increasingly cited by creditors for a new standard this Court fears may prevail.

■ Reliance to the creditor's detriment is the key. It is obvious that the $10,000 new money was extended in reliance upon a false financial statement and as such is not dischargeable. *Household Finance Corp. v. Danns,* 558 F.2d 114 (2d Cir.1977). To that extent the Court in *Carter* would be in accord.

■ This Court disagrees with *Carter* on its analysis of the dischargeability of the renewed portion of a debt. The analysis

starts well enough with a discussion of the importance of reliance.

When renewals are forced on debtors, either as a result of finance company policy or state regulation, neither are the renewals obtained by the debtor nor do the creditors rely on the statements in the renewal process. Debtors only intend to obtain the additional cash advances, not the renewals, and the creditors only rely on the statements in making the advances, not in renewing the prior loans, which are renewed as a consequence of the decision to make the new loans. In such situations, the renewed portion of the debt does not come within the scope of § 17(a)(2) of the Act or § 523(a)(2)(B) of the new one. *Carter,* at 995.

Yet *Carter* goes on to conclude that in cases that allowed discharge of the renewed portion only actual reliance and not the lack of "fresh cash" was important. From there, "compensatory relief"—reimbursement for just that new money upon which there was reliance—gives way to "punitive relief"—the entire debt as long as there was reliance, regardless of fresh cash.

Of course a Court must look specifically at how a debtor "obtained" his credit. There might not have been reliance by a creditor who asked the debtor to renew merely because of state law or bank policy. Yet equally obvious is that there must have been a detriment. *Carter* wrongfully jumped over the requirement of detriment to arrive at "punitive relief" by discussing only fresh cash. In *Danns* there happened to be fresh cash. There could be and have been any of a number of other possible detriments that a Bankruptcy Court might find to be a necessary element. Such is consistent with the legislative history of Section 523(a)(2)(B).

In many cases, a creditor is required by state law to refinance existing credit on which there has been no default. If the creditor does not forfeit remedies *or otherwise rely to his detriment* on a false financial statement with respect to existing credit, then an extension, renewal, or refinancing of such credit is nondis-

chargeable only to the extent of the new money advanced; on the other hand, if an existing loan is in default or the creditor *otherwise reasonably relies to his detriment* on a false financial statement with regard to an existing loan, then the entire debt is nondischargeable under section 523(a)(2)(B). This codifies the reasoning expressed by the second circuit in *In re Danns,* 558 F.2d 114 (2d Cir.1977). 124 Cong.Rec., at S17412 (emphasis supplied).

Such is also consistent with case law. Unfortunately the Court in *Carter* cited a prime example, but for its own proposition. "At least one court (the only one cited by *Carter*) has applied a punitive measure of relief under § 17(a)(2) when the debtor initiated the request for the renewal." *Carter,* at 996. That case, *Municipal Credit Union v. Burton, (In re Burton),* 4 BCD 569 (Bkrtcy.S.D.N.Y.1978), did not involve fresh cash but did involve something "otherwise" upon which the creditor could have relied. The creditor in *Burton,* by foregoing an opportunity to garnish after a default, sustained a detriment. It is for the proposition that a detriment can be something other than fresh cash that this Court cites *Burton.*

Further *Carter* was also incorrect in that there was no finding in *Burton* that the debtor initiated the renewal. As far as who contacted whom to renew on default, this Court on these facts does not feel the issue a relevant one.

Thus there is no authority to adopt a punitive approach, as would the bank have the Court here do. *Carter's* only example was not purely punitive, but merely an example of another type of detriment. Whether or not Congress wanted to maintain some last "punitive" vestige in Section 523(a)(2)(B), there still must be a detriment. How would the creditor have changed his position had he known the true state of the debtor's affairs?

Next, the Court is challenged to ascertain the detriment. Detriment, in the form of fresh cash, is easy to calculate. Yet detriment in the form of foregoing garnishment or releasing rights needs calculation in the form of how much, if anything, could have been realized upon garnishment.

In the case at bar, the $120,000 note was in default in June, 1981 (if not earlier, the Court suspects). The bank requested four individual debts within 10 days. Still, over two and one-half months expired before new notes were issued. Had the bank known the true status of the debtor's affairs in June, 1981, it might not have renewed the debt with Gadberry and might have, because of the default, instituted other legal action against him to collect. Nevertheless, the false statement did not come into play until September, 1981. It appears to the Court that, by that time, the bank was no longer interested in pursuing anyone for a default other than by way of individual notes. Further if, at that late date, the bank had received a true financial statement from Gadberry how could it have changed its position against him anyway. Gadberry had very few assets at that time.

The facts simply do not convince the Court that the bank would have or could have changed its position to its detriment by doing other than refinancing four individual loans.

Therefore, the Court holds that $10,000 owed by J.F. Gadberry to the Central National Bank of Mattoon not be discharged and the $33,000 owed by J.F. Gadberry to the Central National Bank of Mattoon be discharged in bankruptcy.

Mr. Robinson will draw an Order consistent with the Opinion herein expressed encompassing both Counts I and II of the Complaint, and send it to Mr. Barnes for approval as to form.