In re Lawrence J. BARNACLE, Debtor.

NORWEST CARD SERVICES, Plaintiff,

v.

Lawrence J. BARNACLE, Defendant.

Bankruptcy No. 4–83–356.
Adv. No. 4–83–243.

United States Bankruptcy Court,
D. Minnesota.

Oct. 15, 1984.

**51**

David C. Beman, of Stern & Gurstel, Minneapolis, Minn., for plaintiff.

Richard C. Salmen, of Kueppers, Kueppers, Von Feldt & Salmen, St. Paul, Minn., for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

MARGARET A. MAHONEY, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on the complaint of Norwest Card Services objecting to discharge of a debt of $4,137.09 under 11 U.S.C. § 523(a). For the reasons outlined below, I am denying discharge of $2,120.03 of Debtor's debt to Norwest Card Services.

*Facts*

1. Lawrence J. Barnacle (Debtor) filed a voluntary bankruptcy petition on February 28, 1983.

2. Norwest Card Services filed a complaint objecting to discharge of its debt on May 31, 1983, which complaint was timely filed.

3. In his bankruptcy schedules, Debtor listed secured debt of $78,096.23 representing a first and second mortgage on his homestead and a first and second mortgage on his automobile. Debtor listed $51,-880.86 of unsecured debt. These unsecured debts do not include an $11,000 debt to Plaintiff's bookie which was not scheduled. Debtor's unsecured debt includes the claim of Norwest, as well as seven other credit card companies. Debtor also has a significant list of unsecured debts to be paid to individuals representing loans from them to pay his gambling debts.

4. Debtor was engaged in extensive betting and gambling prior to his bankruptcy filing. Until shortly before the bankruptcy, Debtor's wife and employer were not aware of his involvement in gambling.

5. On November 10, 1982, Debtor obtained a second mortgage loan upon his homestead in order to consolidate and pay off many of his bills. At that time, he paid Norwest $1,305.95 paying his bill in full to date.

6. Debtor obtained his Mastercard credit card from Norwest originally in January of 1977. At that time, the credit card had a maximum limit of $1,500. On September 20, 1982, Debtor's Mastercard statement indicated a high balance of $2,017.06 due and owing under the $1,500 credit limit.

7. Debtor telephoned Norwest in September of 1982 requesting an increase in his Mastercard limits from $1,500 to $2,500. Norwest sent Debtor a credit application form which he completed on September 7 and September 8 of 1982. Norwest approved the application for a credit increase to $2,500 on October 25, 1982.

8. Debtor's credit request was submitted in writing. It included a net worth statement. The net worth statement listed assets of Debtor in the amount of $144,000 and debts of $57,000.

9. In September of 1982, Debtor had debts of $82,830 per evidence adduced at the trial. Debtor failed to list on his credit application form a $6,000 debt to American Express Card, for which his card had been cancelled. Debtor also failed to list bank debts and notes of some $17,000 and debts to private individuals of $13,000.

10. Debtor testified that he filled out the credit extension application in a hurry and forgot the missing debts or did not know where to enter them on the form. He also thought that the form was only a formality as the person he had talked to at Norwest on the telephone about his credit extension had stated it was going to be "no problem" since he was a "good customer."

11. Norwest obtained a credit report on Debtor which did not reflect any debt problems for Debtor.

12. Under Norwest's credit application guidelines, Debtor qualified to have his credit limit raised to $2,500 if the information stated in his application was correct. If all Debtor's debts were listed on the application for the additional credit per the evidence adduced at trial, Debtor would not have qualified under the guidelines for the additional credit line.

13. On the basis of Debtor's application, his past payment history with Norwest which was good, and the negative credit check, Norwest extended Debtor's credit line on his Mastercard to $2,500.

14. Debtor (at the time he made his application for extension of credit) knew, or should have known, of his gambling debts to individuals, his cancelled American Express card, and his bank debts which were not listed on his credit application.

15. After obtaining the increased credit on his Mastercard, Debtor's balance increased to $4,137.09 by the time he filed bankruptcy.

16. Debtor attempted to make one payment on the bill of $1,000 in January of 1983. The check was returned to Mastercard marked "Not Sufficient Funds". In the past, Debtor had an arrangement with his bank, Summit National Bank of St. Paul, that such overdraft checks would be honored. This was the first N.S.F. check which he had incurred on his account. He did not intend to write an N.S.F. check to Norwest.

17. Debtor used his Norwest Mastercard for business expenses. He received reimbursements from his employer for business expenses every two or three weeks. In November 1982 to February 1983 he was not using his expense reimbursement to pay his business expenses.

18. Debtor used his Mastercard for some business expenses from November 1982 through February 1983. He also used it for gambling purposes including cash calls at several Atlantic City casinos.

*Conclusions of Law*

1. Debtor obtained an extension of credit from Norwest in the form of an increase in his Mastercard credit card maximum limit from $1,500 to $2,500.

2. Debtor gave to Norwest a materially false credit extension application respecting his financial condition.

3. Norwest reasonably relied on the credit extension application, in conjunction with the credit report and past payment

history of Debtor, in its extension of credit above and beyond $2,017.06.

4. Debtor prepared his credit request for his Mastercard credit limit extension with an intent to deceive Norwest.

5. Debtor did not intend to deceive Norwest by any false representations made in obtaining property by use of his credit card.

### Discussion

Norwest raises two exceptions to discharge in this case—11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B).

11 U.S.C. § 523(a)(2)(A) and (B) provide: Exceptions to discharge:

(a) A discharge under this Section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt ...

(2) For obtaining money, property, services or an extension, renewal or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

### § 523(a)(2)(A)

■ 11 U.S.C. § 523(a)(2)(A) requires proof by clear and convincing evidence that the debtor obtained property by representations the debtor knew were false or by representations made with a reckless disregard of their truthfulness. *In re Johnson*, 40 B.R. 756 (Bkrtcy.D.Minn.1984); *In re*

*Brink*, 27 B.R. 377 (Bkrtcy.W.D.Wis.1983); *In re Schnore*, 13 B.R. 249 (Bkrtcy.W.D. Wis.1981); *In re Buford*, 25 B.R. 477 (Bkrtcy.S.D.N.Y.1982).

■ A debtor who purchases goods on credit through use of a credit card impliedly represents he has the intent and ability to repay the debt. *In re Johnson, supra; In re Lay*, 29 B.R. 258 (Bkrtcy.M.D.Fla. 1983). If a debtor knows when he purchases goods on credit that he cannot pay for them or knows that he intends not to pay for them he obtains the goods through fraud and/or false pretenses and his debt is nondischargeable.

■ In this case, the debtor did not intend to defraud Norwest. Debtor intended to pay the debt. His $1,000 N.S.F. check is evidence of this. An N.S.F. check is *not* conclusive evidence of fraud. *In re Collins*, 28 B.R. 244 (Bkrtcy.W.D.Okla. 1983). In the past Debtor's checks were always covered by Summit National Bank per Debtor's arrangement with the Bank. This was the first check the Bank had ever not covered for him. Debtor did not charge on the account after January 16, 1983 when Debtor saw an attorney about filing bankruptcy. Although Debtor's finances were in disarray, there was not clear and convincing evidence that he did not have the ability to repay this debt. It is significant that his charge card was the card Debtor used for his business expenses. He was reimbursed by his company for all business expenses. Therefore, whatever other problems Debtor had in paying bills, he was routinely being reimbursed for his business expenses. The fact that Debtor testified he used these expenses account reimbursements to pay other expenses at times from November 1982 to February 1983 does not show an inability to repay the debt.

The *Buford* case, *supra*, set forth a list of factors to be considered in determining a debtor's intent to deceive.[1] In this case

---

1. The test in *Buford* for fraud lists the following factors to consider:

1. The age and sophistication of the debtor;

2. The length of time between the incurrence of the charge and the date of filing of the bankruptcy petition;

some of the factors would indicate that there was a fraudulent intent—the nature of the items charged, the age and sophistication of the debtor. Other factors weigh against fraudulent intent—the fact that Debtor first consulted his attorney after the debts were incurred and the fact that he paid $1,000 on the account by a check he thought was good.

The evidence of fraud or false pretenses must be clear and convincing. Norwest has not met the burden of proof as to § 523(a)(2)(A).

### § 523(a)(2)(B)

■ 11 U.S.C. § 523(a)(2)(B) requires proof of several elements again by clear and convincing evidence.

The Debtor must have obtained an extension or refinance of credit. Here Debtor obtained an extension of new credit as to sums he owed over his previous credit balance. Debtor had already obtained credit from Norwest of $2,017.06. Norwest had relied on Debtor's previous credit application for the $2,017.06 credit. Only "fresh cash" given to Debtor above this $2,017.06 extension should be considered here. *In re Thomas*, 21 B.R. 553 (Bkrtcy.E.D.Wis. 1982); *In re Chambers*, 23 B.R. 206 (Bkrtcy.W.D.Wis.1982).

■ The Debtor must have made false representations or acted with false pretenses or actual fraud to obtain the credit. Under § 523(a)(2)(B), I must look to whether the financial statement provided by the Debtor to Norwest evidenced the requisite falsity or fraud by being "materially false". The amount of misstatement in this case is enough to be "material." Debtor misstated his liabilities by at least $20,000 or more (or 25% of his total unsecured debts). He did not state that he had a debt to American Express for $6,000 which had caused his credit card to be cancelled. He

did not list several bank loans or any of his loans to individuals. These misstatements constitute "material" misstatements. Under present case law, a statement in a financial statement is materially false if the false information would affect the creditor's decision to grant or not grant credit. *In re Winfree*, 34 B.R. 879 (Bkrtcy.M.D. Tenn.1983). As stated in *In re Denenberg*, 37 B.R. 267, 271 (Bkrtcy.Mass.1983) a materially false statement is one "which paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *In re Hunt*, 30 B.R. 425 (Bkrtcy.M.D.Tenn. 1983). Debtor did misstate his financial position. The Norwest credit manager testified as to the manner in which extensions of credit were reviewed. The data Debtor provided was an integral part of the facts that Norwest reviewed in making its credit decision.

■ The creditor must reasonably rely on the Debtor's false information. Case law holds that reasonable reliance is to be found if a creditor's actual conduct followed its normal business practices and/or standards in the industry and if the creditor, upon the particular facts acted with ordinary diligence. *In re Denenberg, supra.* This test has been met in this case. The evidence showed that Norwest followed normal practices in requesting Debtors written application for a credit extension. It performed a credit check which revealed no problems. It granted Debtor the credit line increase since the listed debts met its guidelines. It would be unreasonable to expect Norwest to do more.

■ Finally, it must be proved that the Debtor intended to deceive the creditor. The initial burden of proof falls on the

---

3. The date the debtor consults an attorney re filing bankruptcy;
4. The number of charges;
5. The amount of the charges;
6. The financial condition of the debtor at the time of the charges;

7. The amount by which the charges exceed the debtor's credit limit, if any;
8. The nature of the charges.

creditor. The proof must be by clear and convincing evidence. *In re Johnson; supra.* Direct proof of fraud is rarely found. Therefore, intent must be found in inferences to be drawn from the surrounding circumstances. *In re Schlickmann,* 6 B.R. 281 (Bkrtcy.D.Mass.1980). Gross recklessness by a Debtor is enough to prove intent to deceive. *In re Blatz,* 37 B.R. 401 (Bkrtcy.E.D.Wis.1984). If the debtor offers a financial statement to a creditor which contains significant, glaring errors, this shows a total disregard for the creditor, at a minimum, and actual fraud at a maximum. In this case, Norwest proved a prima facie case of fraud by showing a significantly incorrect financial statement. The burden of proof then shifted to the debtor to show how he could have offered such a glaringly incorrect credit application without an intent to deceive. He stated he filled the form out "in a hurry;" he thought, from his telephone conversation with a Norwest employee, that the form was only a formality; he didn't know where to include some of his debts on the form. This evidence is not sufficient to rebut Norwest's case. Debtor was an educated man. He had gambling debts he didn't want his wife or employer to discover. His debts were mounting. He had lost his business expense credit card when American Express cancelled him. He had to have another credit card to which to charge business and other expenses. Therefore, he told Norwest only what he determined would allow a credit card limit increase.

All criteria have been met as to § 523(a)(2)(B) as to the Norwest Master Card balance above and beyond $2,017.06. Since the total debt at filing was $4,137.09, the nondischargeable portion is $2,120.03.

IT IS THEREFORE ORDERED that:

1. Debtor's debt to Norwest Card Services be discharged to the extent of $2,017.06.

2. Debtor's debt of $2,120.03 to Norwest Card Services not be discharged.