In re: David R. JONES and Sharon M. Jones, Debtors.

NORTH SHORE SAVINGS AND LOAN ASSOCIATION, a domestic corporation, Plaintiff,

v.

David R. JONES and Sharon M. Jones, Defendants.

Bankruptcy No. 86–01706.
Adv. No. 86–0417.

United States Bankruptcy Court,
E.D. Wisconsin.

July 8, 1988.

Herbert Levine, Milwaukee, Wis., for plaintiff.

Joseph Esser, Menomonee Falls, Wis., for defendants.

## DECISION

M. DEE McGARITY, Bankruptcy Judge.

This adversary proceeding was commenced by North Shore Savings and Loan to request a denial of the discharge of the debtors' obligation to North Shore under 11 U.S.C. § 523(a)(6) and under 11 U.S.C. § 523(a)(2)(B). Trial was held on April 20, 1988. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). For the reasons stated below, a portion of the debt of David R. Jones to North Shore Savings and Loan Association is nondischargeable, but the debt of Sharon M. Jones is discharged in its entirety.

## FACTS

While residing in Wisconsin, defendant debtor, David R. Jones, borrowed $64,165 in March of 1983 from the plaintiff to purchase a 1983 32–foot Bayliner Conquest power boat. The plaintiff properly perfected its security interest in the boat in Wisconsin in April, 1983.

In November, 1984, the debtors informed Daniel Meiers, an officer of North Shore, that they were going to Florida and were taking the boat with them. Mr. Meiers testified that he understood it was the Jones' custom to spend winters in Florida

and summers in Wisconsin. Once in Florida, David Jones obtained a Florida certificate of title for the boat in December, 1984, which omitted any mention of North Shore's perfected security interest. He testified that the application was filled out by an employee of the state, and he was not asked about a lien. (Ch. 328, Fla.Stat., requires a certificate of title for boats, whereas Wis.Stat. § 30.51 requires the issuance of a number by the Department of Natural Resources for identification purposes only.) According to Florida law, which is similar to Wis.Stat. § 409.103(3)(e), plaintiff's perfected security interest was lost four months after the move because plaintiff did not perfect again in Florida.

Mr. Jones and his wife then negotiated a series of loans from the Barnett Bank in Florida. The Bank required that title to the boat be delivered to Barnett as a condition for a loan, which he did. A revised certificate of title was issued by the State of Florida to David Jones listing Barnett as the first lienholder with a lien of $15,000. David Jones forwarded this certificate of title to Barnett.

When David Jones' loan with the plaintiff came due in April, 1985, the plaintiff sent a renewal application to the debtors' Florida address at David Jones' request. The debtors completed and returned the application and, thereafter, renewed the loan with the plaintiff. This time, both debtors signed the note and security agreement.

The debtors filed their voluntary petition in bankruptcy in April of 1986, and either shortly before or shortly after the filing of the debtors' petition, the plaintiff became aware of the Florida Bank lien. Sometime later, North Shore discovered that its first lien holder status had been lost.

The plaintiff alleges that by permanently removing the boat from Wisconsin without the plaintiff's knowledge or consent and refinancing it in Florida, the debtor, David R. Jones, willfully and maliciously injured the plaintiff by impairing its interest in the collateral within the meaning of 11 U.S.C. § 523(a)(6).[1] There are two acts of the debtor, David R. Jones, which are alleged to come under § 523(a)(6). The first is taking the boat to Florida without the plaintiff's knowledge or consent. The second is using the boat as collateral for new loans from a Florida bank. The creditor also alleges that the debtors renewed their loan by use of a false financial statement, contrary to 11 U.S.C. § 523(a)(2)(B),[2] which resulted in loss to the creditor.

## DISCUSSION

*Section 523(a)(6).*

In order to have a debt declared nondischargeable under § 523(a)(6), the plaintiff/creditor must show that the debtor's act was both "willful" and "malicious." *In re Nelson*, 35 B.R. 765 (Bankr.N.D.Ill. 1983). Bankruptcy courts have consistently defined "willful" as intentional or deliberate. *Id.* at 768. *See also In re Ries*, 22 B.R. 343, 346 (Bankr.W.D.Wis.1982). There has been a split of opinion, however, as to the definition of "malicious." An early line of cases interprets "malicious" as requiring an "intent to do harm" to the particular creditor. *See e.g. In re Matter of Ricketts*, 16 B.R. 833 (Bankr.N.D.Ga. 1982); *In re Aldrich*, 16 B.R. 825 (Bankr. W.D.Ky.1982); *In the Matter of Gentis*, 10

---

1. § 523 Exceptions to Discharge
 (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
 (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

2. § 523 Exceptions to Discharge
 (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
 (B) use of a statement in writing—
 (i) that is materially false;
 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive.

B.R. 209 (Bankr.S.D.Ohio 1981). A more recent line of cases, including opinions from within the Seventh Circuit, follow a looser standard, requiring only a finding of implied or constructive malicious intent. *See e.g. In re Condict,* 71 B.R. 485 (Bankr. N.D.Ill.1987); *In re Hallahan,* 78 B.R. 547 (Bankr.C.D.Ill.1987); *In re Cullen,* 71 B.R. 274 (Bankr.W.D.Wis.1987). *But see In re Wright,* 66 B.R. 403 (Bankr.S.D.Ind.1986) (driving while intoxicated did not qualify as "willful and Malicious act" under 11 U.S.C. § 523(a)(6) without direct evidence of intent to injure).

█ The looser standard applies in this case. Implied or constructive malicious intent can be established by showing that the debtor realized his act would harm the creditor's interest and proceeded in the face of that knowledge. *Nelson, supra,* at 768. If the debtor believed, however erroneously, that he had a right to dispose of the collateral, it is not enough to show that he should have known his act would harm the creditor. Actual knowledge is required. *Ries, supra,* at 347.

█ Section 523(a)(6) of Title 11 is intended to encompass willful and malicious conversion of encumbered property. This would include improper avoidance of a security interest as well as unauthorized sale of collateral and retention of proceeds by the debtor. *Nelson, supra,* at 768, citing the Congressional Record, October 6, 1978, Section 17416.

█ Daniel Meiers, a former loan officer and vice president of North Shore, testified that Mr. Jones asked whether there would be any problem with Florida usage of the boat and expressed his intention to take the boat there. Meiers said he believed that it was Mr. Jones' habit to spend winters in Florida and summers in Wisconsin. It is clear, in other words, that North Shore's loan officer knew that the boat would be removed to Florida for periods which could exceed four months at a time. This is the period of time after which North Shore's first lien holder status would be lost if it did not perfect again in Florida. Wis.Stat. § 409.103(3)(e). Daniel Meiers also testified that he himself was unaware at the time of Mr. Jones' inquiries of the legal effect of removing collateral to Florida. Had Mr. Jones made a formal, written request to move the collateral, the loan officer would have had to research Florida's laws to discover the possible consequences.

Given this evidence, the plaintiff has not borne its burden of proof under § 523(a)(6). It is conceded that Mr. Jones removed the boat "willfully," but there has been no showing that he realized his act would harm the creditor's interest and proceeded in the face of that knowledge, the standard for a finding that the act was "malicious." Even the plaintiff's loan officer did not know that taking the boat out of state could harm the plaintiff's interest. It is extremely unlikely that Mr. Jones would have known it, and the plaintiff has presented no evidence to the contrary. In light of the finding that Mr. Jones did not know taking the boat to Florida would harm North Shore's interest, he would also not have known that borrowing more money using the already encumbered boat as collateral would harm North Shore's interest.

*Section 523(a)(2)(B).*

The plaintiff also alleged that when its loan to David Jones was renewed, the defendant debtors fraudulently represented and warranted in writing that they were the owners of the collateral free of all liens and encumbrances except those of the plaintiffs. Furthermore, the financial statement submitted did not disclose all of the debtors' debts. Since this is a statement respecting the debtors' financial condition, it properly falls under § 523(a)(2)(B).

█ In order to have a debt declared nondischargeable under § 523(a)(2)(B), a creditor must prove all of the following elements by a showing of clear and convincing evidence:

1. the existence of a statement in writing,

2. that is materially false,

3. respecting the debtors' financial condition,

4. upon which the creditor reasonably relied, and

5. that the debtor made with intent to deceive.

11 U.S.C. § 523(a)(2)(B); *In re Blatz*, 37 B.R. 401, 403 (Bankr.E.D.Wis.1984).

In addition, the creditor must show that it sustained the alleged loss and damage as a proximate result of the debtor's financial statement having been published. *Danns v. Household Finance Corp.*, 558 F.2d 114, 116 (2d Cir.1977); *In re Blatz*, 37 B.R. 401, 405–06 (Bankr.E.D.Wis.1984).

 Material falsity has been defined as "an important or substantial untruth." *Matter of Bogstad*, 779 F.2d 370, 357 (7th Cir.1985). The omission, concealment or understatement of any of the debtor's material liabilities constitutes a "materially false" statement. *In re Howard*, 73 B.R. 694, 703 (Bankr.N.D.Ind.1987); *In re Anzman*, 73 B.R. 156, 163 (Bankr.D.Colo.1986); *but see In re Jones*, 49 B.R. 431, 436 (Bankr.D.C.1985) (an omission does not constitute a "representation" for purposes of § 523(a)(2)(B)). Actual knowledge of the falsity of financial information is not required; a creditor can establish intent to deceive by proving reckless indifference to or reckless disregard of the accuracy of the information in the financial statement of the debtor. *Howard, supra,* at 703; *Matter of Garman*, 643 F.2d 1252 (7th Cir. 1980).

 Under § 523(a)(2)(B), intent to deceive may be presumed by use of a false statement. Intent can be rebutted if the debtor denies alleged intent, and then the creditor has the burden of going forward with its proof. The creditor ultimately bears the burden of proof and risk of non-persuasion. If the creditor presents evidence of acts and surrounding circumstances from which intent to deceive could be inferred, the debtor cannot overcome such inference with merely an unsupported assertion of honest intent. *In re Simpson*, 29 B.R. 202 (Bankr.Ia.1983).

At trial, North Shore submitted the signed security agreement and loan application filled out by Mr. Jones for the renewal of his loan. Both he and Mrs. Jones signed these two documents.

 Mrs. Jones claims not to have read either, and North Shore presented no evidence of surrounding circumstances from which any intent on her part to deceive North Shore could be inferred. According to her deposition, which was admitted into evidence at trial, her husband presented her with these papers to be signed, and she merely complied with his request. The original loan was in her husband's name only. North Shore has not claimed that the loan would not have been renewed except for her signature, nor has it advanced any other reason to disbelieve her testimony. Accordingly, it has not borne its burden of proof with regard to the § 523(a)(2)(B) charge against Mrs. Jones.

 Mr. Jones also claims not to have read the security agreement. However, the loan application was filled out in his own hand. The security agreement warranted that the debtors were the owners of the collateral free of all other liens. Mr. Jones asserted as an affirmative defense against this claim that he did not know that his loans with Barnett Bank were secured by his boat. He testified that when he signed the security agreement with Barnett, papers were presented to him for his signature by a secretary at Barnett Bank, and he signed them without ascertaining the nature of the documents.

Mr. Jones' previous experience with secured loans belies this testimony. He had a car repossessed in 1979 for failure to maintain loan payments. He borrowed money for a second car, a 1984 Plymouth Horizon, and gave the lender a security interest in it. He speculated on silver prices, borrowing money to buy silver bars which he left with North Shore to secure the purchase money loan. Barnett Bank similarly required that he leave the certificate of title for the boat with the Bank as a condition of its loan. Furthermore, the revised certificate of title naming Barnett as first lien holder was mailed to him, and he forwarded it to Barnett. He initially testified that he never received the revised title. On cross examination, however, he admit-

ted receiving it, but claimed not to have taken it out of the envelope to look at it.

Mr. Jones also took out a second insurance policy to cover the boat and named Barnett as loss payee while retaining his original policy with duplicate coverage which named North Shore as a payee. He stated that the first policy required by North Shore did not provide broad enough coverage. According to his testimony, the second policy covered the boat in both the Gulf and the Atlantic, while the first covered only Gulf waters. He had an implausible explanation, however, for naming Barnett as loss payee if he did not believe it had a security interest in the boat. He claimed that he intended to collect double damages on a loss to pay both creditors.

In the security agreement with North Shore, Mr. Jones warranted that he owned the boat free of all liens except North Shore's. In the loan application, he omitted any mention of the debt to Barnett Bank although the debt at that time was at least $15,000 (the amount listed as owed to Barnett on the revised certificate of title). The instructions on the application read, "List all debts," in capital letters, and "Attach separate sheet if space inadequate." Four lines were provided for that purpose. Another two lines directly below provided space for information regarding rent, alimony, child support and maintenance. Underneath that was printed in capital letters, "If space above is inadequate for any required information or if you wish to submit additional information, use the following lines." Four more blank lines were provided. Mr. Jones did not use them, nor did he attach a separate sheet. He used the first four lines to list his car loan, boat loan, silver loan and a personal, unsecured loan for $726, all with North Shore Savings and Loan. When asked why he did not list the Barnett loan, he answered that he "ran out of space." He added that he never lists everything on a loan application, and that he did not consider Barnett's $15,000 loan to be a "major obligation." In the section of the application that asks if the applicant has ever been bankrupt, Mr. Jones checked "no," although he received a Chapter 7 discharge in 1979.

North Shore has established by clear and convincing evidence all the elements of § 523(a)(2)(B) with respect to both Mr. Jones' statements on the security agreement and on the loan application. They are statements in writing concerning the debtors' financial condition. They are materially false because they omit any mention of debtors' obligation to Barnett Bank. *In re Howard, supra.* The statements on both documents were made with the intent to deceive as shown by Mr. Jones' admittedly intentional omission of the very debt secured by the same collateral. His knowledge of that additional security interest can be inferred from his experience with collateralized loans and his second insurance policy on the boat naming Barnett as loss payee. Even if he did not read the security agreement, he certainly showed a reckless indifference to the accuracy of the information contained within it. *Howard, supra,* at 703. The misstatements in both documents are consistent in that they both conceal the interest of Barnett Bank.

The reliance of North Shore on the loan application for renewing the loan was demonstrated by the cover letter from Susan C. Millard, Branch Manager of North Shore, which accompanied the loan renewal application sent to the debtor. It read in pertinent part:

> So that I can renew your note, kindly complete the enclosed credit application and return....
>
> * * * * * *
>
> As soon as I have reviewed your new application, I will call you to set up an appointment to close your loan.

The Branch Manager's reliance on the loan application is implicit in this communication. *See Garman, supra,* at 1254.

Reliance on the warranty of no other liens in the security agreement cannot be considered apart from this reliance on the loan application. The security agreement basically denies the same fact omitted in the loan application, that an additional $15,000 lien had been placed on the boat.

North Shore's reliance on the statements in these documents was reasonable without

further investigation since Jones had a substantial credit history with North Shore. *See Garman, supra,* at 1257. (Creditors' reliance on debtor's false financial statement without further investigation was reasonable where debtor had a long standing relationship with creditor prior to default.)

## DAMAGES

■ The legislative history of § 523 contains the following statement:

"In many cases, a creditor is required by state law to refinance existing credit on which there has been no default. If the creditor does not forfeit remedies or otherwise rely to his detriment on a false financial statement with respect to existing credit, then an extension, renewal, or refinancing of credit is nondischargeable only to the extent of the new money advanced; on the other hand, if an existing loan is in default or the creditor otherwise reasonably relies to his detriment on a false financial statement with regard to an existing loan, then the entire debt is nondischargeable under section 523(a)(2)(B). This codifies the reasoning expressed by the second circuit in *In re Danns,* 558 F.2d 114 (2d Cir.1977)."

(Emphasis added.) Statement by the Hon. Don Edwards, September 28, 1978, reprinted in U.S.Code Congressional and Administrative News, 95th Cong., 2d Sess., 5787, 6436, at 6453 (1978).

The court in *Danns* reasoned that only that portion of a creditor's loan which resulted from fraud is nondischargeable. *Id.* at 116. Because the court in that case found only the new cash advanced at the time of renewal nondischargeable, other courts have cited *Danns* for the proposition that nothing but new cash advanced may be nondischargeable. *In re Wright,* 52 B.R. 27, 29 (Bankr.W.D.Pa.1985); *In re Barnacle,* 44 B.R. 50, 54 (Bankr.D.Minn. 1984). However, in *Wright,* the creditor's case was dismissed for failure to show any reliance at all on the false financial statement. In *Barnacle,* the creditor could only show reliance for new cash because the debtor falsified an application to obtain a higher credit limit on a credit card. It seems, in other words, that these cases turned on the issue of reliance, rather than on a rule of nondischargeability for new cash only.

Other courts, citing the legislative history, have ruled that the entire debt may be found nondischargeable. *See In re Tomei,* 24 B.R. 204 (Bankr.W.D.N.Y.1982); *In re Ojeda,* 51 B.R. 91 (Bankr.D.N.M.1985); *In re Richards,* 81 B.R. 527 (Bankr.D.Minn. 1987).

Although the difference between these two lines of cases has been cast as whether only new cash or the entire debt is nondischargeable in a § 523(a)(2)(B) action concerning renewal of existing indebtedness, all the foregoing cases applied a consistent analysis in that they required the creditor to show detrimental reliance as to both new cash advanced at renewal and the foregoing of remedies to collect the original loan for the entire debt to be found nondischargeable.

In *Tomei,* the bank would have been able to collect its entire debt instead of renewing the original loan, but did not do so because of its reliance on the false information in the financial statement. The entire debt was held nondischargeable. In *Ojeda,* the creditor was not able to show such detrimental reliance as to the original debt, so only the new cash advanced was found to have been procured as a result of fraud and, therefore, nondischargeable. In *Richards,* there was no new cash, only renewals of two relatively large loans. The debtor had submitted a false financial statement on which the creditor relied to renew the loans. Although the debtor claimed that the creditor could not have collected anything if it had enforced payment at the time of renewal, he was unable to support this claim. The court characterized this assertion as an affirmative defense which the debtor was required to prove. As a result, the entire debt was found nondischargeable.

All of the cited cases concerning renewals have consistently required that the creditor bear the burden of showing detrimental reliance before any portion of the

debt is found nondischargeable. *See also In re Gadberry*, 37 B.R. 752 (Bankr.C.D.Ill. 1984); *Blatz, supra; In re Greenidge*, 75 B.R. 245 (Bankr.M.D.Ga.1987). *But see In re Carter*, 11 B.R. 992 (Bankr.M.D.Tenn. 1981). (Only new cash was found to come within the scope of § 523(a)(2)(B); therefore, nondischargeability of new cash advanced would be "compensatory;" nondischargeability of refinanced portion was granted as "punitive relief" even though the reliance was not detrimental.)

The court in *Gadberry* posed most succinctly the question which must be asked: "How would the creditor have changed his position had he known the true state of the debtor's affairs?" *Id.* at 754. In *Gadberry*, the debtor caused the bank to rely on a financial statement which was no longer true by assigning the bank the beneficial interest in a land trust already assigned to his partners. In deciding which portion of the debt was nondischargeable, the court noted: "Detriment in the form of fresh cash is easy to calculate. Yet detriment in the form of foregoing garnishment or releasing rights needs calculation in the form of how much, if anything, could have been realized upon garnishment." *Id.* at 754.

In the case at bar, only the renewal was procured through a false financial statement, not the original loan. Mr. Jones has not claimed that collection efforts would have been fruitless at the time of renewal, and North Shore has shown that because of the renewal it forfeited the opportunity to foreclose on the collateral and collect under its second lien holder position. This is the extent of its detrimental reliance. Testimony showed that Mr. Jones had no other unencumbered resources at the time of the renewal.

The boat was purchased in March, 1983, for $64,165, and sold in August, 1986, by the Barnett Bank for $29,000. The original loan was renewed in April, 1985. By a straight line method of depreciation, the boat would have had a market value in April, 1985, of $43,066. As a second lien holder, North Shore would have collected all but the $15,000 owed to the Barnett Bank, or $28,066. This, then, is the amount of the debt which is nondischargeable because this is the amount that North Shore could have collected at the time it renewed the original loan.

In light of this holding, it will not be necessary to rule on the admissibility of a second copy of the bill of sale introduced by North Shore.

An order will be entered by the court finding David R. Jones' debt to the plaintiff, North Shore Savings and Loan, nondischargeable in the amount of $28,066.

This opinion shall stand as the court's findings of fact and conclusions of law under Bankruptcy Rule 7052.