967 F.2d 302
 26 Collier Bankr.Cas.2d 1845, 23 Bankr.Ct.Dec. 220,
Bankr. L. Rep. P 74,689
 In re Bruce L. SIRIANI; Mark W. Stevens; Philip J.
Andrews, Debtors.
Bruce L. SIRIANI; Mark W. Stevens; Philip J. Andrews, Appellants,
v.
NORTHWESTERN NATIONAL INSURANCE COMPANY, OF MILWAUKEE,
WISCONSIN, Appellee.
 No. 91-15856.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 13, 1992.
Decided June 12, 1992.
As Amended June 29, 1992.
 
 Bernard A. Burk, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., for debtors-appellants.
 Leonard J. Martinet, Williams & Martinet, San Francisco, Cal., for appellee.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel.
 Before: GOODWIN, FLETCHER and NELSON, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Bruce L. Siriani, Mark W. Stevens and Philip J. Andrews (the "debtors") appeal the decision of the Bankruptcy Appellate Panel ("BAP") reversing the bankruptcy court's decision that their debt to Northwestern National Insurance Company ("Northwestern") was dischargeable. The BAP found the debt was nondischargeable under 11 U.S.C. 523(a)(2)(B). We affirm.
 
 FACTS
 
 2
 In November, 1983, a limited partnership formed by the debtors and another individual purchased an apartment building in Dallas. A $1.2 million loan from Springbrook Lenders ("Springbrook") partially financed the purchase. The loan was due on September 15, 1985; the debtors expected to sell enough limited partnership interests to pay it off.
 
 
 3
 As a condition of the loan, Springbrook required the debtors to obtain a financial guaranty bond. Northwestern agreed to issue the bond, provided the debtors agreed to indemnify Northwestern for any sums it had to pay Springbrook. Under the indemnity agreement, should a claim be made on the bond, Northwestern required the debtors to deposit funds with Northwestern in the amount of the claim. In addition, the indemnity agreement gave Northwestern security interests in the debtors' personal and other property, and the power of attorney to perfect them at any time.
 
 
 4
 Before the Springbrook loan became due, the debtors realized they would be unable to pay it on the due date. Springbrook agreed to extend the loan for an additional year, provided the bond was also renewed. Before deciding whether to renew, Northwestern requested financial statements from the debtors. The debtors submitted financial statements that omitted substantial obligations owed by them. After receipt of the financial statements, Northwestern agreed to renew the bond. The bankruptcy court found that Northwestern agreed to renew the bond before the original term expired, and that Springbrook and the debtors relied on the agreement to renew. However, because debtors were late in paying fees for the agreement, the official bond renewal was not issued until November, 1985.
 
 
 5
 On March 17, 1986, debtors defaulted on the Springbrook loan, and Springbrook made a claim on the bond. Although the debtors failed to make the deposits required by the agreement, Northwestern took no steps to protect itself, by, for example, seeking to perfect its security interests. On April 25, 1986, other creditors of the debtors filed involuntary chapter 7 petitions against them. Northwestern eventually paid Springbrook $1,610,000 million on the bond.
 
 
 6
 Northwestern filed a claim with the bankruptcy court, alleging that debtors' obligation to it under the indemnity agreement was nondischargeable under section 523(a)(2)(B) of the bankruptcy code because it had relied on fraudulent financial statements in deciding to renew the bond.[1] After trial, the bankruptcy court first issued an oral ruling in favor of Northwestern, but later, after a motion for reconsideration or new trial by the debtors, entered judgment in favor of the debtors. The bankruptcy court found that Northwestern had established that the debtors had made a misrepresentation of material fact, with intent to deceive, on which Northwestern reasonably relied. However, it held that Northwestern had failed to show its losses were proximately caused by the renewal of the bond.
 
 
 7
 Northwestern appealed to the BAP, which reversed.
 
 STANDARD OF REVIEW
 
 8
 The court of appeals reviews the BAP's decision de novo. The bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error. Fireman's Fund Ins. Cos. v. Grover (In re Woodson Co.), 813 F.2d 266, 270 (9th Cir.1987).
 
 
 9
 The court of appeals may affirm on any ground finding support in the record. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).
 
 DISCUSSION
 
 10
 I. Were Northwestern's losses proximately caused by the debtors' misrepresentations?
 
 
 11
 A. Requirements for nondischargeability under section 523(a)(2)(B)
 
 
 12
 At issue here is whether Northwestern, as a creditor seeking to have its claim found nondischargeable, is required to show its losses were proximately caused by the debtors' fraud.
 
 
 13
 This court has not previously ruled on what a creditor must prove in a nondischargeability action under section 523(a)(2)(B). However, we have held that, to recover under companion section 523(a)(2)(A), the creditor must show:
 
 
 14
 (1) a representation of fact by the debtor,
 
 
 15
 (2) that was material,
 
 
 16
 (3) that the debtor knew at the time to be false,
 
 
 17
 (4) that the debtor made with the intention of deceiving the creditor,
 
 
 18
 (5) upon which the creditor relied,
 
 
 19
 (6) that the creditor's reliance was reasonable,
 
 
 20
 (7) that damage proximately resulted from the misrepresentation.
 
 
 21
 Rubin v. West (In re Rubin), 875 F.2d 755, 759 (9th Cir.1989); see also Britton v. Price (In re Britton), 950 F.2d 602, 604 (9th Cir.1991). Section 523(a)(2)(A) differs from section 523(a)(2)(B) only in that the former involves a non-written misrepresentation while the latter involves a false statement in writing; in addition, section 523(a)(2)(A) provides less detail as to what a creditor must show. We conclude that, because the two subsections of section 523 are substantially similar, adoption of the Rubin elements is appropriate for section 523(a)(2)(B) cases. The Eleventh Circuit and several bankruptcy courts also require proof of proximate cause under section 523(a)(2)(B). See Collins v. Palm Beach Savings & Loan (In re Collins), 946 F.2d 815, 816 (11th Cir.1991); see also, e.g., North Shore Savings and Loan Ass'n v. Jones (In re Jones), 88 B.R. 899 (Bankr.E.D.Wis.1988); Armstrong Rubber Co. v. Anzman (In re Anzman), 73 B.R. 156 (Bankr.D.Colo.1986).[2]
 
 
 22
 B. What showing of proximate cause was Northwestern required to make?
 
 
 23
 The bankruptcy court's finding of proximate cause is reviewed for clear error, "even though the finding may depend to some extent upon law." Rubin, 875 F.2d at 758. At issue in this case, however, are the legal underpinnings of the bankruptcy court's decision on this issue: what did Northwestern have to prove in order to satisfy the proximate cause element?
 
 
 24
 The bankruptcy court ruled that Northwestern had failed to show proximate cause because it adduced no evidence that, had it failed to renew the bond, it would have pursued its collection remedies in a timely fashion. The BAP reversed, holding that Northwestern was required to show only that it sustained losses because it renewed the bond.
 
 
 25
 Our analysis differs from that employed by the BAP. The BAP reasoned that the renewal of the bond was the equivalent of a new loan because the term of the previous bond had expired before the renewal, leaving Northwestern with no commitment to the debtors. However, the bankruptcy court had found that Northwestern had agreed to renew the bond before the initial term expired, and that Springbrook and the debtors in entering into the loan extension relied on this agreement. Thus, although documentation of the renewal was not issued until November, 1985, after the debtors had paid the relevant fees, Northwestern earlier had agreed to renew and would have been estopped from denying that it had done so. We, however, affirm the BAP's decision because the bankruptcy court erred in the requirements it imposed on Northwestern in respect to its proof of proximate cause.
 
 
 26
 The bankruptcy court held that, to show proximate cause, Northwestern had to show, in addition to its reasonable reliance on the financial statements, not only that it possessed valuable collection rights at the time it contemplated renewal, and that those rights became worthless during the renewal period, but also that it would have exercised those rights with sufficient alacrity to avoid preference problems.[3]
 
 
 27
 We agree with the bankruptcy court to this extent: in this context, a creditor seeking nondischargeability under section 523(a)(2)(B) must show that it had valuable collection remedies at the time it agreed to renew its commitment to the debtor, and that those remedies later became worthless. See, e.g., Jones, 88 B.R. at 905 (creditor must show "foregoing of remedies to collect original loan for the entire debt to be found nondischargeable"); Household Finance Corp. v. Greenidge (In re Greenidge), 75 B.R. 245, 247 (Bankr.M.D.Ga.1987) (creditor's evidence insufficient to show it forfeited remedies because of debtor's false financial statement); In re Gadberry, 37 B.R. 752, 754 (Bankr.C.D.Ill.1984) (creditor must show value of foregone garnishment rights); Lincoln First Bank v. Tomei (In re Tomei), 24 B.R. 204, 207 (Bankr.W.D.N.Y.1982) (creditor testified it would have initiated collection proceedings had it not received debtor's false statements).
 
 
 28
 However, a creditor is not required to show that, had it not renewed its commitment in reliance on the debtor's fraudulent statements, it would have exercised its collection remedies in a sufficiently timely fashion to collect the debt; the bankruptcy court should not have imposed a "creditor's diligence" requirement. The court relied on two bankruptcy court decisions. In Gadberry, the debtor had guaranteed a portion of a loan issued to a partnership in which he was a partner. At one point, the nervous lender asked each guarantor to pay back part of the debt. However, it never pursued collection on the demand. Subsequently, the lender not only renewed the loan arrangement but added new money to Gadberry's portion of the guaranty, in reliance on a fraudulent financial statement furnished by Gadberry. While the bankruptcy court found the new money portion of Gadberry's debt was nondischargeable, it discharged the earlier debt, finding that the bank's earlier failure to pursue collection from the guarantors indicated that, at the time of renewal, it would not have sought to collect from Gadberry on the initial guaranty in any circumstance. 37 B.R. at 754.
 
 
 29
 In Anzman, the debtor and his partner became the guarantors of debts owed to Armstrong by the tire business they had purchased. The business fell behind in its payments and, after negotiations, Armstrong agreed to a modified payment schedule and to the reopening of open credit lines. In negotiating this agreement, Armstrong relied on false financial statements Anzman submitted. The bankruptcy court held that Armstrong failed to show its losses were proximately caused by Anzman's statements because Armstrong customarily accepted payments of overdue debts from customers and would have found it in its interests to do so in Anzman's case to keep Anzman as a customer. Even had Armstrong known the precarious nature of Anzman's finances it would have taken the business risk. 73 B.R. at 156.
 
 
 30
 We question the soundness of Gadberry and Anzman. Under their approach, the burden on the defrauded creditor is too great, and the bankruptcy court must indulge in entirely too much speculation as to what the creditor might have done in hypothetical circumstances.
 
 
 31
 Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible. But both significance and importance turn upon conclusions in terms of legal policy, so that they depend on whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred.
 
 
 32
 Britton, 950 F.2d at 604 (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 42 at 273 (5th ed. 1984)). At issue in the nondischargeability analysis are the competing interests of the defrauded creditor and the debtor entitled to a "fresh start." See Britton, 950 F.2d at 606. Section 523 does not serve a blindly "punitive" function, Gadberry, 37 B.R. at 754, so the creditor is allowed to recover only those damages caused by the fraud and is not entitled to a reward through the imposition of a penalty on the debtor. Jennen v. Hunter (In re Hunter), 771 F.2d 1126, 1128 (8th Cir.1985). On the other hand, the section also reflects the policy that the fresh start is for the "honest but unfortunate debtor," not the defrauder. Grogan v. Garner, --- U.S. ----, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).
 
 
 33
 The Eleventh Circuit's analysis in Collins reflects the proper balance. In that case, the debtor submitted a false financial statement to the bank; the bank gave him a loan secured by personal property--property which, unbeknownst to the bank, was already pledged twice over. The bank failed to perfect its security interest and was thus unable to foreclose. The debtor filed for bankruptcy protection. The Eleventh Circuit affirmed the bankruptcy court's holding that the debt was nondischargeable; it found that the debtor's fraud, not the bank's failure to perfect, was the proximate cause of the bank's losses. "[T]he Bankruptcy Code does not require such diligence on the part of a creditor induced by fraudulent means in extending credit to a debtor." Collins, 946 F.2d at 816.
 
 
 34
 The speculative nature of the "evidence" the creditor would have to adduce, and the speculative nature of the findings bankruptcy courts would have to make (as exemplified by the decisions in Anzman, Gadberry, and that of the bankruptcy court in this case) also cut against the imposition of such a burden on the creditor. Here, the bankruptcy court assumed, on the basis of Northwestern's failure to act during the five week period between the debtor's default and the involuntary bankruptcy filings, that Northwestern would not have acted in the five month window that would have been available to it between the September, 1985 decision not to renew and the February, 1986 onset of the preference period triggered by the involuntary filing. That's far from certain. Events could have evolved in several other ways. If Northwestern had refused to renew its bond, Springbrook might itself have filed an involuntary petition against the debtors; such a filing would have rendered futile Northwestern's exercise of its collection remedies. Or, if Northwestern had sought to perfect its security interests, its efforts might have triggered an involuntary petition by one of the debtors' other creditors. In almost every case, there will be a range of potential outcomes; we decline to require bankruptcy courts to divine what might have happened.
 
 
 35
 In summary, we agree with the bankruptcy court that Northwestern had to show that the fraud proximately caused its loss by adducing evidence that it relied on the financial statements, that it had valuable collection remedies at the time of renewal, and that such remedies lost value during the renewal period. We disagree with the bankruptcy court's holding that Northwestern was also required to show that it would have pursued collection remedies in a sufficiently timely fashion had it not renewed the bond. We thus affirm the BAP's reversal of the bankruptcy court's decision.
 
 
 36
 II. Did the bankruptcy court commit clear error in finding that Northwestern had reasonably relied on the debtors' fraudulent statements?
 
 
 37
 The debtors argue that, even if Northwestern did not have to meet the diligence requirement, it still failed to establish proximate cause. They contend that the bankruptcy court committed clear error in finding that Northwestern reasonably relied on the debtor's financial statements. They suggest that because Northwestern knew that the debtors were general partners in numerous highly leveraged real estate partnerships, it should have inquired as to whether the debtors had any other contingent liabilities. Had Northwestern done so, it would have uncovered the debtors' personal guarantees of other partnerships--guarantees the debtors concealed when preparing the financial statements.
 
 
 38
 The bankruptcy court acknowledged that the question of whether Northwestern's reliance was reasonable was a close one. It noted first that the financial statements appeared to be complete and "very professional." Northwestern checked out a few references to determine the accuracy of the statements; the bankruptcy court found this was "reasonable inquiry." There were several factors suggesting reliance was unreasonable: Northwestern did not ask for financial statements when it initially issued the bond; the financial statements did not include contingent liabilities, such as the very liability created by the original bond; Northwestern made no inquiry into guaranties. The bankruptcy court found, nonetheless, "that the factors in favor of reasonable reliance are much stronger than those that suggest that reliance was not reasonable. The defendant simply cannot rely on minor clues of falsity in a financial statement that on the whole has all the appearance of being very complete and reliable and where the plaintiff takes reasonable steps to inquire as to the creditworthiness of the defendants...." The bankruptcy court did not commit clear error in this careful analysis; its interpretation of the evidence before it does not give rise to a "definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 Section 523(a)(2)(B) provides:
 A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
 (B) use of a statement in writing--
 (i) that is materially false;
 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive
 11 U.S.C. 523(a)(2)(B)
 
 
 [2]
 In John Deere Co. v. Gerlach (In re Gerlach), 897 F.2d 1048 (10th Cir.1990), the Tenth Circuit held that section 523 "by its terms, only requires an objecting creditor to prove an extension of credit was 'obtained by' fraud for the debt to be excepted from discharge." 897 F.2d at 1051. However, the court later stated that the debt at issue was nondischargeable only "in an amount which it can reasonably estimate as obtained by the fraud." Id. at 1052
 
 
 [3]
 Section 547 of the bankruptcy code allows the trustee to "avoid" (recover for the bankruptcy estate) any "preferential" transfer of the debtor's property (including the grant of a lien), made to satisfy an antecedent debt, while the debtor was insolvent within 90 days before the filing of a bankruptcy petition, and which allows the creditor to receive more than it would otherwise receive under the debtor's liquidation or reorganization plan