UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2262

IN RE: PAUL W. GOODRICH,

Debtor.

SHAWMUT BANK, N.A.,

Plaintiff, Appellant,

v.

PAUL W. GOODRICH,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. A. David Mazzone, U.S. District Judge]

Before

Boudin, Circuit Judge,

Campbell, Senior Circuit Judge,

and Stahl, Circuit Judge.

Michael C. Gilleran with whom Paul M. Tyrrell and Shafner &

Gilleran were on brief for appellant.

Robert H. Quinn with whom Austin S. O'Toole and Quinn and Morris

were on brief for appellee.

July 26, 1993

BOUDIN, Circuit Judge. Shawmut Bank, N.A. asked the

bankruptcy court to rule that the $109,000 debt owed to it by

Paul W. Goodrich is not dischargeable in his Chapter 7

bankruptcy because it was obtained through deliberately false

statements on which the bank relied. The bankruptcy court

held that only $10,000 of the debt was nondischargeable and

the district court affirmed. We conclude that the entire

debt is nondischargeable and remand.

On September 4, 1985, Goodrich signed a promissory note

and credit agreement with Shawmut giving him an unsecured

revolving $100,000 line of credit. This arrangement

reflected his long-standing relationship with the bank and

his partnership in a Boston law firm. Goodrich agreed to pay

periodic finance charges and to repay the outstanding balance

and any accrued interest on demand. He was not asked for a

personal financial statement at the time but agreed to submit

such statements on request. The line of credit was to

expire, and any outstanding principal and interest were

payable, on the anniversary date.

On February 22, 1986, Shawmut increased the line of

credit to $150,000, and then on September 4, 1986, it renewed

the line of credit. On June 24, 1987, Goodrich gave Shawmut

a personal financial statement dated as of December 31, 1986,

which represented that the bank could rely upon it as true

unless given written notice of a change. The line of credit

-2-

was renewed again on September 4, 1987, and again on

September 7, 1988. Prior to the September 4, 1987, renewal,

Goodrich had drawn down and owed $99,000 under the line of

credit. On November 18, 1988, Goodrich drew down an

additional $10,000, making his total debt to Shawmut

$109,000, exclusive of interest.

Thereafter, Goodrich filed for bankruptcy under Chapter

7. Shawmut, on July 8, 1991, began an adversary proceeding

in this bankruptcy objecting to any discharge of Goodrich's

debt to the bank. It claimed that Goodrich in his financial

statement submitted in June 1987 had failed to list $9

million in contingent liabilities and made certain other

material misstatements or omissions. Shawmut invokes 11

U.S.C. 523(a)(2)(B), which provides:

(a) A discharge under section 727,
1141, 1228(a), 1228(b), or 1328(b) of
this title does not discharge an
individual debtor from any debt -
. . . .
(2) for money, property, services, or
an extension, renewal, or refinancing of
credit, to the extent obtained by-
. . . .
(B) use of a statement in writing -
(i) that is materially
false;
(ii) respecting the debtor's or
an insider's financial condition;
(iii) on which the creditor to
whom the debtor is liable for such money,
property, services, or credit reasonably
relied; and
(iv) that the debtor caused to
be made or published with intent to
deceive[.]

-3-

The bankruptcy court, after an evidentiary hearing,

found in an oral opinion that the financial statement did

contain material falsehoods respecting Goodrich's financial

condition made with intent to deceive; and as these findings

are uncontested on this appeal, we need not elaborate. The

bankruptcy judge also found that Shawmut had proved that it

"would not have renewed the loan had Mr. Goodrich made full

and complete disclosure of these contingent liabilities."

But, the bankruptcy judge continued, this fact does not show

that such a refusal to renew would have meant that Goodrich

would then have repaid the loan (which then stood at

$99,000). The oral opinion concluded:

And so, to that extent, to the extent of
the balance which was outstanding at the
time that they [Shawmut] received and
could have relied upon this financial
statement there was no reliance. The
money was already out the door and would
not come home just because a false
financial statement was given.

The bankruptcy judge then ruled that the bank had proved

reliance upon the false financial statement to the extent

that it had advanced $10,000 after the financial statement

was provided to it and that this amount, together with

pertinent costs, was the amount that would not be discharged

by bankruptcy. On appeal, the district court affirmed in a

memorandum, echoing the reasoning of the bankruptcy judge and

relying specifically upon Danns v. Household Finance Corp.,

558 F.2d 114 (2d Cir. 1977), which we discuss below.

-4-

Although we disagree with the outcome reached by the

bankruptcy judge and the district court, it is only fair to

say that this provision of the Bankruptcy Code, governing

nondischargeability for false statements, has spawned a fair

amount of case law, inter-circuit conflicts and considerable

confusion. The seeming simplicity of section 523(a)(2)(B)

conceals not only a couple of linguistic traps but a lineage

of opaque legislative history. Still, the simple language of

section 523(a)(2)(B) is the starting point for analysis and,

in the end, the basis for our decision.

Reading the statute literally, Shawmut appears to meet

each of its requirements needed to make the $99,000 loan

nondischargeable. The $99,000 loan was a "debt" reflecting a

"renewal . . . of credit"; the renewal was "obtained by . . .

use of a statement in writing"; and the writing was

"materially false," it was related to Goodrich's financial

condition, Shawmut "reasonably relied" on it, and it was made

with intent to deceive. Although the statute bars discharge

only "to the extent" that the renewal was obtained by the

false statement, we think this causation element--also

reflected in the statute's "reliance" requirement--is easily

satisfied here as to the full $99,000.

The bank offered evidence from a bank official that the

$99,000 loan would "probably" not have been renewed in either

1987 or 1988 if the true financial liabilities of Goodrich

-5-

had been set forth in the financial statement he submitted;

that the bank relied upon the financial statement in its

renewal of the loan; and that the omission of material

information was a "substantial factor" in causing the

renewal. This evidence, presumably, led to the bankruptcy

court's finding that "the bank has demonstrated by a

preponderance of the evidence that they [sic] would not have

renewed the loan had Mr. Goodrich made full and complete

disclosure . . . ."

The evidence amply supports the finding. Likelihoods

are about all that can be expected where the question is what

the bank would have done five years ago if faced with a

disclosure that did not occur. Indeed, there is case law

that supports the view that it is enough if the misstatement

or omission is a "substantial factor" in the decision to make

or renew a loan. In re Gerlach, 897 F.2d 1048, 1052 (10th

Cir. 1990) (collecting cases). After all, if a financial

statement is materially false and intended to deceive, then a

showing that the creditor "relied" upon it arguably requires

no more than that the creditor took it into account and gave

it weight. Here, the bankruptcy court's explicit finding

already quoted makes fine distinctions unnecessary.

Although each of the statutory requirements of section

523(a)(2)(B) is thus satisfied, Goodrich remarkably enough

does have two decent arguments in his favor. The first is

-6-

that some courts have read into the statute yet another

requirement, not reflected in its explicit language, that the

creditor show that it was damaged by the false statement.

See Norton, Bankruptcy Law and Practice, 27.41, at pt. 27,

p. 76 & n.22 (1991) (collecting cases); cf. In re Siriani,

967 F.2d 302 (9th Cir. 1992) (limited damage requirement).

Damage is easily shown where the bank lends money after

receiving a false statement and in reliance upon it. But in

the case of a renewal of an earlier untainted loan, it is

possible that the bank would have called the loan if accurate

information had been furnished on renewal and yet been unable

to collect a penny before bankruptcy.

This possibility appears to be what the bankruptcy judge

had in mind when he said of the $99,000 that "[t]he money was

already out the door and would not come home just because a

false financial statement was given." Although the

bankruptcy judge used the phrase "no reliance" immediately

before making this statement, a later passage suggests that

he meant that the bank had not--so far as the $99,000 was

concerned--"relied to its detriment." In other words, the

bank relied on the false statement in renewing the loan (the

judge had already so found), but--in the judge's view--the

bank had not shown that the reliance caused the ultimate

loss.

-7-

The bank on appeal zealously contests this "finding" of

no detriment. It asserts that Goodrich's financial statement

on renewal showed that he had over $800,000 in cash, bank

deposits and marketable securities. It follows, says

Shawmut, that the bank could have collected the money by

calling the loan or by insisting that securities or real

property interests of Goodrich be pledged to secure the loan.

In any event, Shawmut argues, there is no requirement that it

show detriment in the sense of ultimate loss; reasonable

reliance on the false statement in renewing the loan is

enough.

We agree with Shawmut that the only detriment that need

be shown is the renewal of the loan. To be sure, it would

not be absurd to require, in addition, that the bank show

that it could--or even would--have collected on the loan

prior to bankruptcy but for the renewal. Some courts have

done so. The nondischargeability provisions are frequently

construed in favor of debtors. 3 Collier on Bankruptcy

523.05A (15th ed. 1993) (collecting cases). Further, one

could argue that if the bank was not ultimately harmed by the

renewal, it should not be able to improve its situation in

the bankruptcy proceeding based on the happenstance that the

renewal was based on a false statement.

The difficulty is that including this further

requirement of actual damage is a policy choice. There is no

-8-

indication in the statutory language that Congress made such

a choice, and the evidence from legislative history is

inconclusive. The statute is quite detailed in its

conditions for nondischargeability. Had Congress wished to

add "damage" as an element, it could easily have done so,

especially since some of the decisions favoring this

requirement were issued before the elaboration and

reenactment of section 523(a)(2)(B) in 1978. Congress, as we

shall see, actually had some knowledge of case law construing

the predecessor section when it adopted its new version.

If it considered the matter at all, Congress could

easily have concluded on policy grounds that a damage

requirement was not appropriate. The debtor, by hypothesis,

has caused the trouble by making a materially false statement

with intent to deceive and the creditor has reasonably relied

upon the statement in renewing the loan. Congress could have

thought that making the bank shoulder the further burden of

proving that it could have collected the loan prior to

bankruptcy--a matter of solvency on which the debtor has most

of the information--was not a proper addition to the

compromises reflected in section 523(a)(2)(B).

The legislative history of section 523(a)(2)(B) is

invoked at some length by both sides, and it does in fact

discuss the case in which a loan is renewed. We find the

discussion tangled, if not contradictory, but note that it

-9-

lends some support to Shawmut by stressing that "[t]he amount

of the debt made nondischargeable on account of a false

financial statement is not limited to `new value' extended

when a loan is rolled over." H. Rep. No. 595, 95th Cong.,

1st Sess. 129-30 (1977). The problem is that the question

here is when, and on what conditions, is the "old money" made

nondischargeable, and on that issue the same legislative

history may be more confusing than helpful. Id.1

In all events, even if Congress never considered the

point one way or the other, the outcome is the same.

Congress enacted a detailed statute without an explicit

damage requirement. In the face of conflicting policies for

and against, there is no warrant for the court to add such a

requirement. Accordingly, there is no need here to weigh the

bank's evidence or disturb the bankruptcy judge's conclusion

that there was no detriment, in the sense he used the term,

so far as the $99,000 is concerned. Instead we hold that

detriment or damage in that sense is not required for

nondischargeability. Accord In re Gerlach, 897 F.2d 1048

(10th Cir. 1990). To the extent that the Ninth Circuit is in

1Just as the House Report is on balance helpful to
Shawmut, so there are floor statements (quoted below) that
are marginally helpful to Goodrich. This floor language does
use the phrase "relied to his detriment," as the bankruptcy
judge did in this case; but the phrase was used only in the
context of discussing the special problem of In re Danns, and

we decline to read it as a general gloss on the statute,
which contains no such words.

-10-

disagreement, see In re Siriani, we prefer to follow In re

Gerlach for the reasons already set forth.

Yet there is more to be said. The district court, in

affirming the bankruptcy court, used some of the same

reasoning but also invoked a different argument, renewed by

Goodrich in this court, by relying upon Danns v. Household

Finance Corp., 558 F.2d 114 (2d Cir. 1977). Danns is a

curious case decided under the predecessor to section

523(a)(2)(B) which used largely similar language. There the

debtor secured a new loan from a finance company based on

false statements; and the question was whether this false

statement also rendered nondischargeable an earlier untainted

loan that the finance company consolidated with the new one

simply because state law forbad the company from having two

loans to the same debtor.

The Second Circuit ruled in a very brief opinion that

"there was no evidence that the original loan was renewed in

reliance on the false representations," but instead it was

renewed and consolidated because of the state law. 558 F.2d

at 116. Thus, said the court, the renewal was not "a true

extension of the original loan; the record does not show that

[the original loan] . . . would have fallen due sooner had it

not been for the refinancing." Id. The court concluded that

"the only credit extended in reliance on Danns'

-11-

misrepresentation was the additional amount loaned," and only

this new cash was nondischargeable. Id.

We have devoted this space to describing Danns because

Congress, in adopting section 523(a)(2)(B) in the following

year, may be taken to have endorsed it by name. After the

bill emerged from a House-Senate Conference Committee,

Section 523(a)(2)(B) was explained to both the House and

Senate in the following terms:

In many cases, a creditor is required
by state law to refinance existing credit
on which there has been no default. If
the creditor does not forfeit remedies or
otherwise rely to his detriment on a
false financial statement with respect to
existing credit, then an extension
renewal, or refinancing of such credit is
nondischargeable only to the extent of
the new money advanced; on the other
hand, if an existing loan is in default
or the creditor otherwise reasonably
relies to his detriment on a false
financial statement with regard to an
existing loan, then the entire debt is
nondischargeable under section
523(a)(2)(B). This codifies the
reasoning expressed by the second circuit
in In re Danns, 558 F.2d 114 (2d [C]ir.

1977).

124 Cong. Rec. 24, 32399 (1978) (statement of Rep. Edwards),

124 Cong. Rec. 25, 33998 (1978) (statement of Sen.

DeConcini). We do not find this general language very

helpful in resolving the present case--there was no state law

here requiring refinancing and, while the $99,000 loan was

not "in default," Goodrich's debt to Shawmut was repayable on

demand. Further, we regard the floor discussion more as an

-12-

attempt to explain and approve Danns than as a general gloss

on the statute.

Nevertheless, the floor statements are pretty good

evidence that Congress approved of Danns and, on that

assumption, it is appropriate to measure our case against the

rationale of Danns. The Second Circuit's holding was framed

as an interpretation of the "reliance" requirement that is

explicit in the statute. The court said that the finance

company did not "rely" on the false statement in continuing

the original loan because the old loan was not up for renewal

at the time of the new loan, and the old loan was

consolidated and renewed solely because of New York's "one

loan" law. Danns may have depended also on the court's sense

of fairness. After all, whatever the causal relationship

between the false statement and the renewal of the old loan,

it was sheer accident--a twist of New York law--that the old

untainted loan was renewed rather than left alone.

By contrast, Goodrich's loan expired in September 1987,

and then again in September 1988, unless renewed. It was the

bank that called for the financial statement prior to the

September 1987 renewal, presumably because it had an interest

in managing the line of credit and the $99,000 loan. So far

as appears, the later draw down of $10,000 more, which

occurred in late 1988, was not an issue when the bank

accepted the false financial statement and considered it in

-13-

renewing the loan in 1987. Here, the evidence showed that

the bank did "rely" on the false statement in renewing a loan

that would otherwise have fallen due. Accordingly, we think

that Danns is distinguishable in both letter and spirit.

We therefore vacate the judgment of the district court

and remand to the bankruptcy court with directions to include

the $99,000 original loan in the amount of debt deemed

nondischargeable, together with the later $10,000 loan whose

status is undisputed. The question of what costs and fees

are appropriately due to Shawmut is not before us, and we do

not address it.

It is so ordered.

-14-