**In re Paul T. LOCKE, Elfriede H. Locke, d/b/a Roxbury Properties, and Elfriede H. Schneider, Debtors.**

**Paul T. LOCKE, Appellant,**

**v.**

**UNITED STATES TRUSTEE, James A. Milner, and Elfriede H. Locke, Appellees.**

**BAP No. CC–95–1842–HMeJ. Bankruptcy No. LA93–26758 VZ. Adv. LA93–04407.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted March 20, 1996.

Decided June 21, 1996.

Paul T. Locke, Law Offices of Paul T. Locke, Woodland Hills, CA, Appellant in Pro. Per.

Cheryl A. Isele, Law Offices of Hothen & Isele, San Francisco, CA, for James A. Milner.

Before: HAGAN, MEYERS, and JONES, Bankruptcy Judges.

## OPINION

HAGAN, Bankruptcy Judge:

Paul T. Locke ("Debtor") is a debtor under chapter 7 of Title 11, United States Code. James A. Milner ("Milner") filed an action against the Debtor, seeking to have a debt declared nondischargeable under section [1]

1. Unless otherwise specified, all references to "section" are to the respective section of the Bankruptcy Code, Title 11, United States Code.

523(a)(2)(A). After a trial, the bankruptcy court granted a judgment in favor of Milner. The Debtor appeals. WE AFFIRM.

## FACTS

### 1. Milner Provides Letters of Credit to Secure the 10940 Wilshire Lease.

The Debtor is an attorney specializing in business litigation; he appears in this appeal *in propria persona.* During the times at issue in this case, the Debtor was involved in real estate investments. In 1988, the Debtor's corporation entered into a lease with Wilshire Westwood Associates ("Landlord") for three floors of a building located at 10940 Wilshire Boulevard in Los Angeles ("10940 Wilshire"). The Debtor personally guaranteed the lease obligations. Under the 10940 Wilshire lease, the Debtor was required to post a security deposit in the amount of $300,000. This security deposit was to be in the form of a letter of credit payable to the Landlord. The letter of credit was to be for a term of one year, and renewed annually. The Landlord could draw on the letter of credit during the 30 days preceding its expiration, unless the Landlord had received a renewal or replacement of the letter of credit.

The Debtor did not have sufficient funds or credit to put up the letter of credit. In 1989, the Debtor and Milner discussed the possibility of Milner using his credit to obtain the letter of credit required under the 10940 Wilshire lease. In July, 1989, Milner obtained a letter of credit for the benefit of the Landlord ("First Letter of Credit"). The First Letter of Credit was scheduled to expire on June 30, 1990. The Debtor promised that he would obtain another letter of credit, to be substituted for the First Letter of Credit on its expiration.

The Debtor was sued by Mitsui Manufacturers Bank ("Mitsui"). Mitsui recorded notices of attachment against property held by the Debtor. On November 14, 1989, four notices of attachment were recorded by Mit-

sui against 450 North Bedford Drive in Beverly Hills ("450 North Bedford"), a medical building owned by the Debtor and his former wife.[2]

On January 24, 1990, the Debtor and Mitsui executed a "Stipulation for Entry of Judgment Against Paul Locke" ("Stipulated Judgment"). The Stipulated Judgment provided for entry of judgment against the Debtor in the amount of $2,512,732.52. The Stipulated Judgment provided that the judgment in favor of Mitsui would be entered if the Debtor defaulted. The Stipulated Judgment was not filed with the court until January 22, 1991.

In early 1990, the Debtor was unable to obtain a superseding letter of credit. Milner and the Debtor began discussions regarding whether and under what terms Milner would obtain a second letter of credit. The Debtor offered Milner a security interest in 450 North Bedford.

In a document dated June 21, 1990, Milner and the Debtor entered into an agreement setting forth terms for the issuance of the new letter of credit (the "Indemnity Agreement"). Milner was represented by an attorney, who drafted the Indemnity Agreement.

Paragraph 9(f) of the Indemnity Agreement states that the Debtor warrants that

[t]here is no suit, action, arbitration, or legal, administrative, or other proceeding, or governmental investigation pending, or threatened, against or affecting PRINCIPALS [the Debtor and his wife], or the Securing Property [450 North Bedford], or the transaction contemplated hereby, except the following:

*NONE.*

Indemnity Agreement, Debtor's Excerpts of Record, Exh. 42, at 7 (emphasis in original).

The transaction was conducted through escrow. The bank issued the new letter of credit ("Second Letter of Credit") on July 2, 1990. At that time, and assuming that the Mitsui attachments were in fact removed

---

**2.** Although the Debtor's former wife was technically a party to the underlying adversary proceeding, the bankruptcy court held that the debt was dischargeable as to her. Milner has not appealed this aspect of the judgment.

from the title to 450 North Bedford,[3] Milner's position in the property was worth approximately $1.7 million.

The Debtor subsequently defaulted on the 10940 Wilshire lease, and the Landlord called the Second Letter of Credit. Milner attempted to foreclose on the 450 North Bedford property. On July 30, 1991, the scheduled day of the sale, Milner discovered that the Debtor had obtained a 24–hour extension of the sale. During this period, the Debtor transferred his half-interest in the property to Nacresa Corporation for no consideration. Nacresa Corporation was controlled by Steve Wald, an independent contractor who worked for the Debtor. Nacresa Corporation filed a petition for relief in bankruptcy the next day. The 450 North Bedford property was subsequently foreclosed by a more senior lienholder. By that time prices for real estate in the area had dropped as part of a general decline in prices in the local real estate market, and Milner received nothing.

### 2. Undisclosed Litigation.

The Debtor had leased three floors of a building at One Sansome Street in San Francisco ("One Sansome Street"). The Debtor then subleased the property to numerous tenants. Approximately three months before the Indemnity Agreement was signed, on April 1, 1990, the One Sansome Street landlord served all of the tenants with three-day eviction notices. The One Sansome Street landlord contended that the Debtor owed rent but had failed to pay it, while the Debtor argued that (1) the obligation to pay rent had not yet arisen under the lease, and (2) the One Sansome Street landlord was required to arbitrate the dispute. The Debtor admitted that the purpose for the eviction notices was not to actually evict the tenants, who were the source of income for the property.

The Debtor filed a lawsuit against the One Sansome Street landlord that same month. The One Sansome Street landlord counterclaimed in August, 1990, for $702,000. The suit was subsequently settled. The Debtor

never informed Milner of the three-day eviction notices, or of the lawsuit he filed against the One Sansome Street landlord.

The Debtor was a general partner of DMG Associates, a limited partnership. In late 1989, DMG Associates was sued over asbestos by a sublessor of a property known as One Wilshire. DMG Associates in turn sued the owner of the building. The Debtor was added to the litigation personally in September, 1990. The sublessor eventually obtained a judgment against DMG Associates, and a personal judgment against the Debtor for approximately $1 million in 1991 or 1992. The Debtor never disclosed this lawsuit to Milner.

### 3. Procedural Posture.

The Debtor filed for the protection of bankruptcy on May 11, 1993. Milner commenced an adversary proceeding against the Debtor and his wife, seeking to have the debt declared nondischargeable. After a trial, the court held that $300,000 of the debt owed by the Debtor to Milner was nondischargeable under section 523(a)(2)(A). The Debtor's former wife was held entitled to a discharge of the debt.

The basis for the court's judgment was as follows. The court rejected the contention that the Debtor had made a material misrepresentation regarding the Mitsui lawsuit; the existence of the suit had been adequately disclosed. However, the court found that the Debtor had made a material misrepresentation by stating that there were no lawsuits without disclosing the One Sansome Street litigation.

The court also found that the failure to disclose the DMG Associates litigation was a material misrepresentation. Although the Debtor was not personally named in the DMG Associates litigation at the time, the Debtor was an attorney, and he knew that under California law as a general partner of DMG Associates he would be potentially personally liable for any damages resulting from the litigation.

**3.** Milner strongly contends that the Mitsui attachments were never removed from the title to 450 North Bedford. The record is unclear as to whether any admissible evidence was introduced to that effect. We find it unnecessary to resolve this issue.

The court concluded that the Debtor had made the misrepresentation with the intent to deceive, that Milner justifiably relied upon the misrepresentation, and that Milner's reliance proximately caused loss. The court found against the Debtor and in favor of Milner for $300,000. The judgment was entered on July 20, 1995. The Debtor timely appealed.

## ISSUES

1. Whether the bankruptcy court correctly found that· the debt owing Milner was nondischargeable under section 523(a)(2)(A).

2. Whether the Debtor was entitled to a jury trial.

## STANDARD OF REVIEW

The bankruptcy court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed de novo. *Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani)*, 967 F.2d 302, 303–04 (9th Cir.1992).

## DISCUSSION

*1. Motion to Strike.*

In his opening brief, Milner moved to strike three of the exhibits to the Debtor's excerpts of record: Exhibit 1, Exhibit 13, and Exhibit 43. These exhibits were never actually introduced into evidence by Milner. The Debtor made no response to this request in his reply brief. We grant the motion and strike the exhibits.

*2. Overview of Section 523(a)(2)(A).*

Section 523 provides that a debtor cannot obtain a discharge in chapter 7 for any debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). A creditor must prove the following elements for a debt to be held nondischargeable under section 523(a)(2)(A):

(1) [that] the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations;

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1457 (9th Cir.1992) (alteration in original) (quoting *In re Britton*, 950 F.2d 602, 604 (9th Cir.1991)). The creditor's reliance upon the representation must be justifiable. *Field v. Mans*, —— U.S. ——, —— – ——, 116 S.Ct. 437, 445–46, 133 L.Ed.2d 351 (1995); *Kirsh*, 973 F.2d at 1460.

*3. The Debtor Knowingly Made False Representations.*

■ The bankruptcy court properly concluded that the Debtor knowingly made false representations. The Debtor plainly warranted, under paragraph 9(f) of the Indemnity Agreement, that there were no lawsuits, arbitrations, or other proceedings pending against him or affecting him. The Debtor admitted that he never told Milner about either the One Sansome Street proceedings, or the DMG Associates litigation. The failure to disclose these matters made paragraph 9(f) of the Indemnity Agreement false.[4]

**4.** The Debtor contends that paragraph 9(f) had been left in the agreement by mistake, because the paragraph stated that there were no lawsuits when one lawsuit (Mitsui) was disclosed in the Indemnity Agreement itself. No testimony was presented to indicate that the provision was left in by mistake.

Moreover, the mere fact that the Mitsui litigation was not disclosed in paragraph 9(f) does not render paragraph 9(f) a nullity. *See* Cal.Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); § 1652 ("Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract."). In

The Debtor contends that he was not required to disclose his lawsuit against the One Sansome Street landlord, because it was a lawsuit by him, not against him. There is no merit to this contention. The One Sansome Street dispute resulted from the Debtor's alleged failure to pay rent. The One Sansome Street landlord contended that rent was due under the lease, while the Debtor argued that the rent obligation had not yet arisen. The One Sansome Street landlord's attempt to collect the rent was certainly a pending or threatened action against the Debtor or affecting the Debtor.

The One Sansome Street landlord filed eviction notices against the tenants based on this failure. The eviction notices were a "legal, administrative, or other proceeding ... against or affecting" the Debtor, and were within the plain language of paragraph 9(f).

The Debtor repeatedly testified at trial that the One Sansome Street landlord should not have filed eviction notices, but should instead have arbitrated the dispute under the lease agreement. Indeed, it was the One Sansome Street landlord's failure to seek arbitration that seems to have been part of the basis for the Debtor's lawsuit. Paragraph 9(f) specifically included arbitrations.

The Debtor also contends that he was under no obligation to disclose the DMG Associates litigation. He presents three reasons for this: (1) he was not personally named in the lawsuit until after the Second Letter of Credit was issued; (2) a cross-complaint had been filed against the owner of the building; and (3) Mitsui had already attached all of the Debtor's property, and Milner's security was superior to Mitsui's attachments. A lawsuit against a partnership is certainly a lawsuit affecting a general partner of the partnership. The fact that DMG Associates cross-complained against the owner of the building, or that Mitsui had already attached all of the Debtor's property, are irrelevant to the question of whether paragraph 9(f) was false.

light of the Indemnity Agreement as a whole, Paragraph 9(f) warrants that there were no un-

*4. The Debtor Intended to Deceive Milner.*

Intent may be inferred from the circumstances. *Alexander & Alexander of Washington, Inc. v. Hultquist (In re Hultquist),* 101 B.R. 180, 183 (9th Cir. BAP 1989). The Debtor had personally guaranteed the 10940 Wilshire lease. The Debtor has repeatedly contended that he did not have the resources to obtain a substitute letter of credit before the First Letter of Credit ran out. If the Debtor failed to obtain a new letter of credit, the default on the 10940 Wilshire lease would have immediately worsened his already precarious financial position. The bankruptcy court found that Milner did not want to renew the First Letter of Credit, a conclusion that was not clearly erroneous. The Debtor had a strong economic incentive to deceive Milner regarding the existence of the One Sansome Street action and the DMG Associates litigation, in order to obtain the Second Letter of Credit. The bankruptcy court's finding of intent to deceive was not clearly erroneous.

*5. Milner Justifiably Relied Upon the Representations.*

The first issue is whether Milner actually relied upon the false representations. The bankruptcy court did not commit clear error in so finding. Milner testified that the absence of lawsuits was important to him because he was interested in more than just the security provided by the Indemnity Agreement; he was also concerned with the "ability to get repaid." *See* Transcript of July 11, 1995, at 116. Milner also testified that he would not have entered into the Indemnity Agreement had he known of the One Sansome Street action or the DMG Associates litigation, because the Indemnity Agreement would then have been too risky. Transcript of July 11, 1995, at 120. The bankruptcy court did not clearly err in finding that Milner actually relied upon the misrepresentation of paragraph 9(f).

The second issue is whether Milner's reliance was justifiable. The Debtor contends that Milner could not have justifiably

disclosed lawsuits.

relied upon the misrepresentation, because Milner knew of the Mitsui litigation even though paragraph 9(f) stated that there were no pending lawsuits.

A lower court's finding of justifiable reliance is reviewed for clear error. *Kirsh,* 973 F.2d at 1456. Here, the Debtor represented that there were no lawsuits pending or affecting the Debtor. The Debtor failed to disclose either the One Sansome Street action or the DMG Associates litigation. The failure to disclose the lawsuits was not such that Milner would have recognized it from a cursory glance. *Field,* — U.S. at —, 116 S.Ct. at 444. The fact that paragraph 9(f) said there were no lawsuits, when the Indemnity Agreement elsewhere disclosed one lawsuit, would not have told Milner that he was being deceived, only that the Indemnity Agreement was poorly drafted. Disclosure of one lawsuit is not a disclosure of all lawsuits. The Debtor cannot escape the consequences of his misrepresentation by suggesting that Milner might have discovered it through investigation. *Field,* — U.S. at —, 116 S.Ct. at 444; *Kirsh,* 973 F.2d at 1458–59.[5]

Milner could, and justifiably did, rely upon the clause as indicating that there were no undisclosed lawsuits. The bankruptcy court's finding of justifiable reliance is therefore not clearly erroneous.

*6. Milner's Damages Were Proximately Caused by the Misrepresentation.*

The final element required under section 523(a)(2)(A) is that the misrepresentation proximately caused the loss to the creditor. Under the 10940 Wilshire lease, the Landlord could have drawn on the First Letter of Credit during the 30 days prior to expiration unless the letter of credit was replaced. The Landlord already had the First Letter of Credit in its possession. The Debtor therefore contends that Milner parted with no property as a result of the misrepresentations.

We reject this argument. Section 523(a)(2) includes not only money, but also "an extension, renewal, or refinancing of credit," to the extent obtained by the false representations. 11 U.S.C. § 523(a)(2). The Indemnity Agreement and Second Letter of Credit at a minimum constituted a renewal or refinancing of the First Letter of Credit.

The Debtor also contends that Milner has not shown that his security in the 450 North Bedford property was displaced or otherwise interfered with because of the lawsuits. Under section 523(a)(2)(A), when a creditor does not advance new money based on a false representation, the creditor must show "that it had valuable collection remedies at the time of the extension or renewal, that it did not exercise [those remedies] in reliance on the debtor's misrepresentation[,] and that those remedies lost value during the renewal or extension period. . . ." *Cho Hung Bank v. Kim (In re Kim),* 163 B.R. 157, 161 (9th Cir. BAP 1994), *aff'd & adopted,* 62 F.3d 1511 (9th Cir.1995). *See Siriani,* 967 F.2d at 305–06 (action under section 523(a)(2)(B)).

Milner had valuable collection remedies at the time he obtained the Second Letter of Credit. The threat was that the Landlord would draw down the First Letter of Credit during the 30 days prior to its expiration, unless a substitute letter of credit was presented. The First Letter of Credit expired on June 30, 1990, but the Second Letter of Credit was not issued until July 2, 1990, and the escrow may not have closed until July 3 (according to the Debtor's own testimony; Transcript of July 12, 1995, at 107). The 30–day collection period completely expired, and the Landlord was left unsecured for at least one day; yet the Landlord did not draw down the First Letter of Credit. Consequently, Milner has made a prima facie showing that the Landlord would not have called the First Letter of Credit had Milner refused to replace it with the Second Letter of Credit. Since the Landlord would not have called the First Letter of Credit if Milner had refused to renew, Milner had a "valuable collection right."[6]

---

5. The bankruptcy court properly noted it would have been impractical, if not impossible, for Milner to have conducted an investigation that would have revealed the other lawsuits.

6. The Indemnity Agreement was signed in late June. It is possible that the Landlord did not

The Debtor is not saved by the alleged oversecured position he provided Milner in 450 North Bedford. It was reasonably foreseeable that real property values might decline so as to destroy Milner's security. *See Britton v. Price (In re Britton)*, 950 F.2d 602, 604–05 (9th Cir.1991) (debtor persuaded creditor to undergo plastic surgery by falsely presenting himself as a doctor, and creditor was injured by malpractice of the doctor who actually performed the operation; debtor's false representation proximately caused injury, because medical malpractice was reasonably foreseeable result of surgery).

### 7. Milner Is Not Entitled to Relief.

■ Milner has requested that the Panel conform the underlying judgment to the terms of the judgment as announced orally by the bankruptcy court. The request would expand Milner's rights. Milner did not file a cross-appeal, "which is generally a prerequisite for an appellee who seeks alteration of a judgment to enlarge the relief granted by the trial court." *Animal Protection Institute v. Hodel*, 860 F.2d 920, 928 (9th Cir.1988). For this reason, we decline to grant this request.

### 8. The Debtor Was Not Entitled to a Jury Trial.

■ The Debtor contends that he should have been granted a trial by jury on the dischargeability action. Both the Debtor and Milner demanded a trial by jury in their initial pleadings below.

The panel has previously held that there is no right to a jury trial in an adversary proceeding to determine whether a debt is dischargeable. *Schieber v. Hooper (In re Hooper)*, 112 B.R. 1009, 1012–13 (9th Cir. BAP 1990). However, the panel expressly left open the question of whether there may be a right to a jury trial on the underlying

issues of liability and damages. *Hooper*, 112 B.R. at 1012–13 & nn. 6–7.

A creditor who submits a claim against a bankruptcy estate becomes subject to the bankruptcy court's equitable jurisdiction over the debtor's counterclaims against the creditor. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59 n. 14, 109 S.Ct. 2782, 2799 n. 14, 106 L.Ed.2d 26 (1989). This is so even though the creditor would have been entitled to a jury trial on the counterclaims had no proof of claim been filed, even though the creditor had no alternative forum in which to pursue its claims, and even though the counterclaims may result in a judgment against the creditor in excess of the creditor's proof of claim. 492 U.S. at 59–60 n. 14, 109 S.Ct. at 2799–2800 n. 14. Or, as the Supreme Court stated in *Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990):

> In *Granfinanciera*, we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power. 492 U.S., at 58–59, and n. 14, 109 S.Ct. at 2799, and n. 14 (citing *Katchen [v. Landy]*, *supra*, [382 U.S. 323,] at 336 [86 S.Ct. 467, 476, 15 L.Ed.2d 391] [ (1966) ] ). If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity. *Ibid.* In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction*. *Granfinanciera*, *supra*, [492 U.S.] at 57–58, 109 S.Ct. at 2798–99. As such, there is no Seventh Amendment right to a jury trial. If a party does *not* submit a claim against the bankruptcy estate, however, the trust-

---

draw down the First Letter of Credit because it relied upon Milner's commitment to obtain a new letter of credit. The Debtor presented no evidence to that effect, however. The fact remains that although there was no superseding letter of credit as required by the 10940 Wilshire lease, the Landlord permitted the 30–day collection period to elapse without drawing down the First Letter of Credit.

Even if the Landlord had drawn down the First Letter of Credit, Milner would have been entitled to proceed against the security provided in connection with the First Letter of Credit. The Debtor's own testimony established that this security was worth approximately $125,000. *See* Transcript of July 12, 1995, at 104 (equity of $50,000 in one house, and of $75,000 in another).

ee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer. In those circumstances the preference defendant is entitled to a jury trial. 492 U.S., at 58–59, 109 S.Ct. at 2799.

*Langenkamp,* 498 U.S. at 44–45, 111 S.Ct. at 331 (emphasis in original).

We conclude that there is no right to jury trial on the issue of liability and damages where a complaint objecting to nondischargeability has been filed. A nondischargeability proceeding is the determination of an unliquidated and disputed claim, with the addition of the nondischargeability issue. There is no meaningful distinction between the determination of liability and damages for the purpose of dischargeability, and the determination of liability and damages for the purpose of allowing or disallowing an unliquidated and disputed proof of claim. There is no right to trial by jury where a proof of claim has been filed, *see Langenkamp,* 498 U.S. at 44–45, 111 S.Ct. at 331–32, and there is no right to trial by jury on the dischargeability issue, *Hooper,* 112 B.R. at 1012. There is, accordingly, no right to trial by jury in nondischargeability proceedings.

Moreover, "[i]ssues surrounding a debtor's discharge and the dischargeability of certain debts are inextricably bound to and arise only in connection with bankruptcy relief because such issues concern whether the debtor will be granted the protection and benefits of bankruptcy." *Hooper,* 112 B.R. at 1012. The determination of liability and damages in a nondischargeability proceeding is a mere adjunct to the determination of the discharge issue. The determination of liability and damages in a nondischargeability proceeding is therefore like the determination of counterclaims where a proof of claim has been filed; it is "integral to the restructuring of the debtor-creditor relationship." *Langenkamp,* 498 U.S. at 44, 111 S.Ct. at 331. The bankruptcy court's equitable jurisdiction permits resolution of the issue without a jury.

## CONCLUSION

The bankruptcy court did not err in holding the debt owed Milner to be nondischargeable. The Debtor was not entitled to a jury trial. Milner's application for affirmative relief is denied. We AFFIRM.